48 So.2d 78 (1950)
STATE ex rel. TAMPA, FLORIDA, COMPANY OF JEHOVAH'S WITNESSES, NORTH UNIT, Inc.
v.
CITY OF TAMPA et al.
Supreme Court of Florida, en Banc.
October 6, 1950.
Rehearing Denied October 27, 1950.
Charles W. Bryan, Tampa, and Hayden C. Covington, Brooklyn, N.Y., for appellant.
Karl E. Whitaker and Ralph A. Marsicano, Tampa, for appellees.
TERRELL, Justice.
On petition of appellants, a religious organization, alternative writ of mandamus was directed to appellees commanding them to issue a permit to construct a church on lots 3 and 4 East Bungalow Park Subdivision in the City of Tampa or to show cause on a day certain why they refuse to do so. Following a plethora of pleading which we do not detail, an order was entered quashing the alternative writ. The relators appealed.
It appears that the lots described were secured by relators for the purpose of constructing a house of worship, that they were located in a part of the city zoned for single family residences but did not exclude the erection of churches, convents and Sunday school buildings thereon. Relators' application for permit was denied on the ground that Ordinance No. 1206-A, under which it was sought, required that all "places of assembly" have space for off-street parking as a condition precedent to construction and the application did not meet that requirement. The alternative writ was quashed for the same reason.
The point for determination is (1) whether or not the relators' application made a substantial showing of compliance with Ordinance 1206-A, as to provision for off-street parking, and (2) in view of the guaranties of the Fourteenth Amendment to the Federal Constitution and the Constitution of the State of Florida, can the city enforce such a requirement as a prerequisite to constructing a place of worship?
The requirement of space for off-street parking was imposed by the ordinance on the theory that Tampa is a fast growing city, that traffic congestion is getting more *79 serious, that traffic hazards are increased by parking along the streets and that such a requirement is essential to the peace, welfare and safety of the people. The alternative writ was quashed on the ground that relators failed to prove a clear legal right to the relief prayed for. The permit was denied solely on the ground that the space shown to be available for off-street parking was inadequate.
Summarized the evidence shows that the street in front of the church is 30 feet, two inches wide, that lots 3 and 4 front 100 feet on said street, that the church as proposed, is 32 by 64 feet, has a maximum seating capacity for 182 persons and that it has off-street parking space as measured by the ordinance (100 square feet for every three persons) to accommodate 213 persons. It was shown that church attendance ranges from 115 to 182 persons and that not more than three-fourths of them owned automobiles and require parking space.
The contention that people congregating for religious purposes cause such congestion as to create a traffic hazard has very little in substance to support it. Religious services are normally for brief periods two or three days in the week and this at hours when traffic is lightest  early in the morning, early in the evening and at 10:00 and 11:00 on Sundays. Many churches are like this one, in residential areas, where traffic is not heavy and where there are side streets and other facilities for parking. The church involved here is a small church which is shown to have ample off-street parking space for all ordinary purposes. It would rarely if ever require parking space on the street in front of the church. Even if rare occasions should require parking a few cars on the streets we cannot say that a traffic hazard would be created. This is certainly a case in which the balance of convenience rule as to range in judgment might be applied.
In our economy, churches, schools, play grounds, and other community institutions occupy a very different status in the regulating aspect from purely business enterprises where people gather in companies. They have always been thought to be important assets to our cultural, social and moral needs and many of them are marked by "slow", "silent", "caution" or similar warnings. The public tends to recognize these warnings and when the zoning ordinance purports to enforce them in such a way as to impose an undue hardship on a church, they have usually been stricken down. Which is the more important to preserve and foster an attitude of respect or reverence for these institutions or throw it to the discard in order that the careless and unthinking may rip through the streets ad lib with no thought for the safety of man or beast?
There is another reason, no doubt the primary one, why the church is not bound by some of the regulations imposed on other institutions. In American life the family is the foundation on which democratic institutions are reared. The church and the school are but auxiliaries to the family. The school, private, public and college is the offspring of the church. Different species of democracy have existed for more than 2,000 years, but democracy as we know it has never existed among the unchurched. A people unschooled about the sovereignty of God, the ten commandments and the ethics of Jesus, could never have evolved the Bill of Rights, the Declaration of Independence and the Constitution. There is not one solitary fundamental principle of our democratic policy that did not stem directly from the basic moral concepts as embodied in the Decalog and the ethics of Jesus.
No one knew this better than the Founding Fathers. Hence we say that when the church enters the picture different considerations actuate any and all spheres of regulation. When exposed to the illuminating power of common sense the regulation drawn in question has very little to support it. It is a matter of common knowledge that traffic hazards about the church are of unusually rare occurrence, much less rare than they are in the home or out on the highway. For every traffic injury on the highway about the church you can chalk up hundreds of them from slips in the bath room. Perhaps the traffic department should require more nonskid *80 mats on the floor. Drive through any municipality in this country between the Atlantic and the Pacific, about 11 a.m. and 7 p.m. on Sundays and 7 p.m. on Wednesdays and you will find hundreds of cars parked along the street adjacent to the churches, the owners attending religious services. To undertake the prohibition of this practice would be futile. There is no showing here that a different rule should govern appellant. Suffice it to say that we think it has made a showing of substantial compliance with the ordinance.
We therefore conclude that as to appellants the denial of the permit as requested was arbitrary and unreasonable, (1) because the provisions of the ordinance were substantially complied with, and (2) there is no showing that the ordinance had any relation to the public health, morals, safety or welfare. This being our view, it becomes unnecessary to discuss the second phase of the question.
It follows that the judgment appealed from must be and is hereby reversed.
ADAMS, C.J., and CHAPMAN, SEBRING and ROBERTS, JJ., concur.